IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>DEANGELIO NOYE,<br><br>    Defendant. | No. 19-CR-78 CJW-MAR<br><br>**MEMORANDUM<br>OPINION AND ORDER** |

## I. INTRODUCTION

This matter is before the Court on defendant's Motion for Compassionate Release filed on June 4, 2020. (Docs. 58 & 59). On June 24, 2020, the government timely filed a brief in resistance. (Doc. 63). On June 29, 2020, defendant timely filed a reply. (Doc. 69). Oral argument was not requested and is not necessary. *See* LR 7(c). For the following reasons, the Court **denies** defendant's motion.

## II. RELEVANT BACKGROUND

On April 13, 2017, and March 23, 2018, defendant was issued a permit to acquire a pistol or revolver in Cedar Rapids, Iowa. (Doc. 28, at 4). Between August 5, 2017, and October 12, 2018, defendant purchased at least eight handguns ("Firearms 1, 2, 3, 4, 5, 6, 7, and 8"). (*Id.*). During each purchase, defendant indicated on various forms he was not an unlawful user of any controlled substances. (*Id.*). Defendant was in fact a regular user of marijuana and knowingly falsified these forms to the contrary. (*Id.*).

On September 21, 2018, officers recovered Firearm 7 from a juvenile who abandoned it during a foot pursuit. (*Id.*, at 5). On October 12, 2018, officer recovered Firearm 8 during the traffic stop of B.G. (*Id.*). B.G. and Firearm 8 were connected by

descriptions to a shooting that occurred the day before. (*Id.*). Later that day, on October 12, 2018, defendant reported to officers that someone had stolen Firearms 1 and 3–8 from his residence. (*Id.*). After investigating defendant's report, officers believed defendant falsely reported the burglary and that defendant was selling the firearms to others unlawfully. (*Id.*). Defendant denied this accusation but did tell officers that he frequently used firearms at a shooting range. (*Id.*). Defendant also recounted that he had pawned Firearm 6 in September 2018 and it had not been stolen, which officers later confirmed. (*Id.*). On October 17, 2018, P.Y. informed officers that several juveniles discussed defendant purchasing firearms for them. (*Id.*).

On October 30, 2018, officers searched defendant's residence pursuant to a warrant and found marijuana in baggies, a scale, shotgun shells, ammunition, handgun magazines, a handgun holster, multiple handgun boxes, two bags of white pills, and five purplish pills inside a cigarillo package inside a headphone box. (*Id.*). Officers also searched three cell phones seized from defendant's residence. (*Id.*, at 6). One of the phones "contained several images and messages depicting the use or sale of controlled substances" from February 14, 2018, through October 30, 2018. (*Id.*). Officers also discovered an email from defendant to State Farm which reported, at least in part falsely, that the Firearms were stolen along with a pair of jeans and an Xbox. (*Id.*). Defendant was paid $2,035.56 for these items. (*Id.*). That same day, officers searched P.Y.'s residence pursuant to a warrant and recovered Firearm 5, a handgun magazine with a holster, a box of ammunition, and additional handgun rounds. (*Id.*). On May 22, 2019, T.P. testified that defendant sold her a significant amount of Percocet pills—which defendant had a lawful prescription for—and THC cartridges, the former of which was corroborated by text messages. (*Id.*, at 7). T.P. also testified she had not seen defendant with a firearm but believed he was armed, and that defendant's house had previously been broken into. (*Id.*).

On July 24, 2019, a grand jury issued an Indictment charging defendant with possession of a firearm by a felon in violation of Title 18, United States Code, Sections 922(g)(3) and 924(a)(2). (Doc. 2). On July 25, 2019, officers arrested defendant. (Doc. 5). That same day, defendant pleaded not guilty and was detained pending a hearing. (Doc. 8). On July 30, 2019, defendant was released pending trial. (Doc. 14). On September 9, 2019, defendant changed his plea to guilty pursuant to a plea deal with the government and was again released. (Docs. 19 & 20). On September 24, 2019, the Court accepted defendant's plea. (Doc. 22). While on release, defendant failed to appear for urine testing on three occasions, failed to attend substance abuse treatment on two occasions, and, although he reported contact with law enforcement officers during a traffic stop, falsely reported officers had not recovered any contraband when, in fact, they recovered marijuana from the car. (Doc. 30, at 1).

On December 12, 2019, the United States Probation Office ("USPO") filed defendant's final presentence investigation report ("PSR"). (Doc. 28). Defendant was, as he still is now, 27 years old. (*Id.*, at 2). Defendant was born in Chicago, Illinois and currently residing in Tama, Iowa. (*Id.*). His parents ended their relationship shortly after he was born. (*Id.*, at 9). Defendant's father was a "heavy drinker," had bipolar disorder, and was a mechanic until he suffered a disabling stroke. (*Id.*). Defendant's mother was a nurse and also had bipolar disorder. (*Id.*). Defendant reported having a good relationship with both his parents. (*Id.*). Defendant was in a long-term relationship with a nurse. (*Id.*). Defendant's work history was minimal and episodic. (*Id.*, at 12–13). He frequently quit jobs due to his medical issues or for unspecified reasons. (*Id.*). Defendant graduated high school and attended community college for a few months. (*Id.*, at 12). Defendant had no criminal history aside from driving on a suspended license once. (*Id.*, at 8).

3

Case 1:19-cr-00078-CJW-MAR    Document 71    Filed 07/22/20    Page 3 of 14

Defendant was diagnosed with type 1 diabetes mellitus in December 1994 at age 2. (*Id.*, at 10). The Iowa Department of Human Services became involved during defendant's childhood due to his "numerous" hospital trips resulting from his improperly monitored blood sugars. At times, defendant was suffering from diabetic ketoacidosis and/or becoming hyperglycemic. (*Id.*). Defendant's diabetes was compounded by his neuropathy. (*Id.*). In 2016, a doctor found that some of defendant's symptoms result from "cannabis hyperemesis or gastroparesis induced" by his diabetes. (*Id.*). Defendant received ongoing care for his diabetes. (*Id.*). Defendant asserted he used marijuana to supplement his Percocet prescription. (*Id.*). He reported that he receives disability benefits for his diabetes. (*Id.*). Defendant had mental health diagnoses for attention hyperactivity disorder, major depressive disorder, anxiety disorder, and panic disorder as well as noted mood swings, tiredness, restlessness, "blow ups," and irritability. (*Id.*, at 10–11). Defendant acknowledged that "he kicked and punched things when he was frustrated." (*Id.*, at 10). Defendant completed a mental health assessment and was assigned a therapy animal. (*Id.*, at 11). Defendant was also diagnosed as an excessive gambler and compulsive spender. (*Id.*). Defendant reported normal use of alcohol, abusing cough medicine on a few occasions, and daily use of marijuana from ages 19 to 26, which he contended was mostly for pain relief. (*Id.*). Defendant completed substance abuse treatment and was diagnosed with cannabis use disorder, severe. (*Id.*, at 12).

On January 28, 2020, the Court sentenced defendant. (Doc. 41). Defendant was in criminal history category I with a total offense level of 15, yielding an advisory guideline range of imprisonment of 18 to 24 months followed by up to three years on supervised release. (Doc. 28, at 15). Defendant moved for a downward variance based on the nature of the offense and his characteristics, including his health. (Doc. 35-1). The Court denied his motion and sentenced him to 18 months' imprisonment followed by three years on supervised release. (Doc. 41). Defendant was released and directed to

surrender for imprisonment on February 12, 2020. (*Id.*). On February 11, 2020, defendant timely appealed his sentence. (Doc. 44). On June 12, 2020, the Eighth Circuit Court of Appeals affirmed defendant's sentence.[1] (Doc. 62). Defendant is currently incarcerated at the Linn County Correctional Center with a projected release date of May 17, 2021. (Doc. 59, at 2). He is not in BOP custody due to limitations on transfers amid the COVID-19 pandemic. (*Id.*).

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

---

[1] Defendant's Motion for Compassionate Release now before the Court was filed on June 4, 2020, before his appeal was resolved. (Docs. 58 & 62). Because defendant's appeal has since been denied, any issue of authority presented by his appeal is now moot.

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the United States Sentencing Guideline ("USSG") discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

Section 3582(c)(1)(A) states a court may reduce a term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" Here, defendant is not in BOP custody. The government does not assert exhaustion as a bar to defendant's motion. (Doc. 63, at 9). The Court agrees that when a defendant is not currently in BOP custody but is instead held in a state or county facility indefinitely awaiting transfer to the BOP, the exhaustion requirement "is either satisfied or excused." *United States v. Levy*, No. 16-cv-270 (ARR), 2020 WL 2393837, at *3 (E.D.N.Y. May 12, 2020). Thus, exhaustion is not an issue here. *See also* (Docs. 59–1 & 59–2) (containing defendant's request to the BOP and the BOP's denial based on their inability to evaluate defendant).

### B. Extraordinary and Compelling Reason

Defendant argues an extraordinary and compelling reason for release is present because his medical conditions put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 59, at 4–8). Defendant cites his type 1 diabetes, hypertension,[2] and asthma. (*Id.*, at 5–6). The government argues defendant's conditions

---

[2] Hypertension refers to high blood pressure. Blood pressure of less than 120/80 mm Hg is considered within normal range. *Understanding Blood Pressure Readings*, American Heart Association, https://www.-heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings. Elevated blood pressure is when readings consistently show 120–129 systolic and less than 80 mm Hg diastolic. *Id.* Hypertension Stage 1 is when readings consistently show 130–139 systolic or 80–89 mm Hg diastolic. *Id.* Hypertension Stage 2 is when readings consistently show 140/99 mm Hg or higher. *Id.* Hypertensive crisis, which requires immediate medical attention, is when readings suddenly exceed 180/120 mm Hg. *Id.*

are insufficient. (Doc. 63, at 14–15).[3] The presence of COVID-19 at a defendant's specific facility or within the BOP generally can constitute an extraordinary and compelling reason for compassionate release if the defendant is particularly susceptible to COVID-19 due to their age or underlying health conditions. *See Burnside*, 2020 WL 3443944, at \*7 (compiling cases); *see also People Who are at Increased Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions-/people-at-increased-risk.html.

Given defendant was sentenced only five months ago, the Court has a limited window into his health while incarcerated. Defendant offers the opinion of his treating physician, Dr. Robert Schultes, who opines defendant is more susceptible to COVID-19 given his conditions of type 1 diabetes, diabetic gastroparesis, asthma, and polyneuropathy and histories of sinus tachycardia, acute kidney disease, hypernatremia, and metabolic acidosis. (Doc. 59–3). Many of these conditions are not discussed in defendant's 2020 medical records or his PSR. It does not appear defendant has been diagnosed with hypertension. Defendant's blood pressure has been measured at 120/76, 128/82, and 128/78, which are all on the border of normal blood pressure or slightly elevated, but not hypertensive. (Doc. 59–4, at 8, 68, 77). There is no discussion of hypertension or heart issues in the record. Defendant is prescribed an inhaler as needed. (*Id.*, at 10). His asthma is noted but not otherwise discussed. (*Id.*, at 68, 77). On May 4, 2020, defendant was not experiencing any chest pain or shortness of breath. (*Id.*, at 120). Aside from his diabetes, defendant reported having "no other acute medical

---

[3] The government also argues that defendant's health conditions are "no different than when he was sentenced[.]" (Doc. 63, at 14–15). Although it does not appear defendant's health care needs have changed drastically over the past five months, the Court in January 2020 was not able to consider defendant's health in light of an international pandemic.

8

concerns" on that date. Thus, although the Court notes defendant has some other minor health concerns, his only significant concern appears to be his type 1 diabetes.

The record reflects defendant's diabetes is serious. On at least two occasions in 2020, a doctor described his condition as brittle diabetes (*Id.*, at 12, 14), meaning it is difficult to control and characterized by drastic swings in blood sugar levels, *Brittle Diabetes*, National Center for Advancing Translational Sciences, https://rarediseases-.info.nih.gov/diseases/11900/brittle-diabetes#:~:text=Brittle%20diabetes%20is%20a-%20term,to%20too%20low%20(%20hypoglycemia%20). Brittle diabetes can cause frequent and lengthy hospitalizations and can even be fatal. *Id.* Persons with type 1 diabetes like defendant are particularly at risk. *See id.* Defendant is prescribed an insulin pen. (*Id.*, at 10). On May 24, 2020, defendant requested diabetic shoes because his "neuropathy [wa]s getting worse." (Doc. 59–4, at 16). On May 1, 2020, defendant reported his blood sugar was 346, far above the normal upper limit of 99 or 140 after eating.[4] (*Id.*, at 23); *see also What are Normal Blood Glucose Levels?*, Virginia Mason Medical Center, https://www.virginia-mason.org/whatarenormalbloodglucoselevels (hereinafter *Blood Glucose*, Virginia Mason). On May 15, 2020, defendant's blood sugar tested at 39, far below the normal lower limit of 70. (Doc. 59–4, at 19); *see also Blood Glucose*, Virginia Mason. On May 26, 2020, defendant was found sweating and mumbling in his bed. (Doc. 59–4, at 15). A test revealed his blood sugar was at 44. (*Id.*). These drastic blood sugar levels support defendant's diagnosis of brittle diabetes. It appears defendant's swings in blood sugar are caused in part by his limited ability to control his diet while incarcerated. *See, e.g.*, (*Id.*, at 21, 22, 30, 31, 35) (noting his difficulties with dry cereal, raw vegetables, beans, apples, lactose, and pork). Defendant

---

[4] Earlier this year, defendant's blood sugar tested as high as 550. (Doc. 59–4, at 42).

is also noted, however, as being "a non-compliant diabetic." (*Id.*, at 14). He has refused to attend multiple medical appointments. (*Id.*, at 17, 18, 25).

Although defendant's condition is serious, type 1 diabetes has not clearly been established as a condition which elevates a person's susceptibility to COVID-19. The CDC states that type 2 diabetes increases a person's risk of severe illness from COVID-19 and that type 1 diabetes "may increase" a person's risk. *People of Any Age with Underlying Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov-/need-extra-precautions/people-with-medical-conditions.html#diabetes. The American Diabetes Association, however, makes no distinction between the two types of diabetes: "[W]e don't know of any reason to think COVID-19 will pose a difference in risk between type 1 and type 2 diabetes." *How COVID-19 Impacts People with Diabetes*, American Diabetes Association, https://www.diabetes.org/coronavirus-covid-19/how-coronavirus-impacts-people-with-diabetes. Generally, the underlying reason COVID-19 presents a higher risk of severe complications to diabetic persons is that it interferes with their glycemic control. Ebekozien, et al., *Type 1 Diabetes and COVID-19: Preliminary Findings from a Multicenter Surveillance Study in the U.S.*, American Diabetes Association, at 1 https://care.diabetesjournals.org/content/early/2020/06/05/dc20-1088 (May 16, 2020). Dr. K.M. Venkat Narayan, professor of global health and epidemiology at Emory University, highlights that persons with diabetes should check their blood sugar regularly and keep it under "good control" during the pandemic. Dr. Hassal Lee, *People with Type 1 Diabetes May be at High Risk for Severe Illness Related to Coronavirus: Study* ABC News, https://abcnews.go.com/Health/type-diabetics-high-risk-severe-illness-related-coronavirus/story?id=71153382. Obviously, "disruptions to work, care and daily routines make it harder to maintain good blood sugar control." *Id*. Even so, "[m]uch more research is needed before we can know for sure what the true risks are, particularly for Type 1 diabetes." *Id*.

Some courts have found that uncontrolled type 1 diabetes presents an extraordinary and compelling reason for release amid the pandemic or have not drawn a meaningful distinction between the types of diabetes. *United States v. Joseph*, No. 18-CR-156, 2020 U.S. Dist. LEXIS 109075, at *2–3, *5 (E.D. Wis. June 17, 2020) (granting release to an inmate whose most significant medical concern was her type 1 diabetes but who also had chronic pancreatitis, a pulmonary embolism, and various other conditions); *United States v. Bowman*, No. 1:15CR00025-001, 2020 U.S. Dist. LEXIS 90402, at *1–3, *5, n1 (W.D. Va. May 22, 2020) (finding defendant's uncontrolled diabetes, without regard to type, presented an extraordinary and compelling reason for release but ultimately denying his motion due to the lack of COVID-19 cases in the defendant's facility).

In considering defendant's conditions, the Court must also evaluate to what extent he is at risk of exposure to COVID-19 in the Linn County jail. There are no known positive cases of COVID-19 at the Linn County jail. Although a staff person tested positive for COVID-19 in April 2020, inmates were never exposed, and it appears the virus was not transmitted to any other staff persons. Grace King, *Deputy at Linn County Correctional Center Tests Positive for Coronavirus*, The Gazette, https://www.the-gazette.com/subject/news/public-safety/deputy-at-linn-county-correctional-center-tests-positive-for-coronavirus-20200420. The lack of COVID-19 in the Linn County jail at this time, although it significantly diminishes defendant's risk, does not wholly bar his motion. *See United States v. Oltmanns*, No. 09-CR-1016-CJW-MAR, 2020 WL 3453843, at *6 (N.D. Iowa June 24, 2020) (compiling cases in which courts granted release due to the status of the virus in the BOP generally.)

This is a close case. Defendant is only 27 years old. (Doc. 28, at 2). The record indicates defendant's hypertension and asthma concerns are minimal. His diabetes, however, is serious and uncontrolled. It is unclear to what extent this lack of control is due to his noncompliance and to what extent his type 1 diabetes elevates his risk of severe

11

Case 1:19-cr-00078-CJW-MAR   Document 71   Filed 07/22/20   Page 11 of 14

consequences amid the pandemic. Given that COVID-19 is generally a threat because it further destabilizes a person's glycemic control, it appears defendant would be at an elevated risk. There are, however, no cases in his facility. Although his diabetes is cause for concern, it does not appear he has been hospitalized and staff have been responsive to his needs. In sum, the Court finds defendant's health conditions, primarily his uncontrolled type I diabetes, presents a marginal extraordinary and compelling reason for release.

### C. *Section 3553(a) Factors and Danger to Community*

Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

Some mitigating factors are present, most notably that defendant has essentially no criminal history, and he has a stable release plan. (Doc. 69–1). The Court is troubled, however, by defendant's March 30, 2020 letter in which he argues his sentence was excessive because he has no criminal history and the reason he smoked marijuana "was to relieve medical pain" caused by his diabetes. (Doc. 59–5, at 1). It is mitigating that this letter was apparently submitted as part of his appeal. (*Id.*, at 3). The letter also

shows, however, that defendant has not fully accepted responsibility during the less than five months of incarceration he has served of his 18-month sentence. Defendant purchased eight firearms and, each time, knowingly falsified official forms to do so. Defendant at best failed to secure these firearms and many were later found to be used in connection with criminal activity. Defendant submitted an at least partially false insurance claim in relation to the firearms. Officers recovered supplies and messages that suggest defendant not only personally used marijuana but distributed it. Defendant also sold his prescription Percocet pills and THC cartridges. This is not a case where defendant happened to have a firearm and also smoked marijuana on occasion for pain relief. The record instead shows daily marijuana use, possession of a significant number of firearms, and involvement in drug distribution. Moreover, defendant cannot merely elect to sell his Percocet pills and use marijuana for his pain instead. In fact, at least one doctor concluded marijuana exacerbated and/or complicated his diabetes. His diagnosis of severe cannabis use disorder and the frequency of his use call into question whether his use was purely medicinal. Regardless of the purpose, he knew it was illegal for him to use marijuana and he knew it was illegal for him to possess firearms simultaneous to that use.

The Court finds defendant has not been adequately deterred by less than five months incarceration. Reducing his sentence by more than two thirds now would be contrary to the goals of 3553(a). The Court finds defendant's health risks are not substantial enough to warrant release in light of these factors at this time, particularly given that he is housed in a facility that has had no positive cases among its inmate population at any time.

13

Case 1:19-cr-00078-CJW-MAR   Document 71   Filed 07/22/20   Page 13 of 14

## V. CONCLUSION

For these reasons, defendant's Motion for Compassionate Release is **denied**. (Doc. 56). Defendant must serve the remainder of his term of incarceration as previously directed. (Doc. 31).

**IT IS SO ORDERED** this 22nd day of July, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa